IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEPHEN BUSHANSKY, individually and on behalf of all others similarly situated, | ) ) ) | Case No. |
| Plaintiff, | ) ) ) | |
| v. | ) ) | **COMPLAINT - CLASS ACTION** |
| PVR PARTNERS, L.P., PVR GP, LLC, WILLIAM, H. SHEA JR., EDWARD B. CLOUES II, JAMES L. GARDNER, ROBERT J. HALL, THOMAS W. HOFMANN, E. BARTOW JONES, MARSHA R. PERELMAN, JOHN C. VAN RODEN JR., ANDREW W. WARD, JONATHAN B. WELLER, REGENCY ENERGY PARTNERS LP, REGENCY GP LP and RVP LLC, | ) ) ) ) ) ) ) ) ) ) ) | **DEMAND FOR JURY TRIAL** |
| Defendants. | ) ) | |

**CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTY
AND VIOLATIONS OF FEDERAL SECURITIES LAWS**

Plaintiff Stephen Bushansky ("Plaintiff"), by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

1.     Plaintiff brings this class action individually and on behalf of all other similarly situated unitholders of PVR Partners, L.P. ("PVR" or the "Partnership") against PVR, its general partner, PVR GP, LLC ("PVR GP"), and PVR GP's Board of Directors (the "Board" or the "Individual Defendants," identified below), Regency Energy Partners LP ("Regency"), its wholly-owned subsidiary, RVP LLC ("Merger Sub"), and Regency's general partner, Regency GP LP ("Regency GP") in connection with their attempt to sell the Partnership to Regency by means of an unfair process for an unfair and inadequate price.  Plaintiff also brings claims against Defendants (defined herein) for their violations of Sections 14(a) and 20(a) of the

Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder ("Rule 14a-9").

2.      On October 10, 2013, Regency and the Partnership announced that, along with certain of affiliates, they had entered into a definitive agreement and plan of merger dated October 9, 2013 under which Regency, through Merger Sub, will acquire all of the outstanding units of PVR in a mixed cash and unit transaction (the "Proposed Transaction").  Under the terms of the Proposed Transaction, for each PVR common unit, PVR unitholders will be entitled to receive 1.020 common units of Regency ("Exchange Ratio"), and a one-time cash payment based on the difference between PVR's annualized distribution less Regency's annualized distribution multiplied by the Exchange Ratio.  Defendants purport that the implied value of the consideration PVR unitholders will receive is approximately $28.68 per common unit, based on Regency's closing price as of October 9, 2013. The Proposed Transaction is valued at approximately $5.6 billion, including the assumption of net debt of $1.8 billion. Following the completion of the Proposed Transaction, PVR unitholders will be substantially diluted and expected to hold only 38% of the combined entity.

3.      The Individual Defendants have violated PVR's partnership agreement dated May 17, 2012 ("LPA," as further described below) and breached their fiduciary duties to Plaintiff and other PVR unitholders by agreeing to the Proposed Transaction for inadequate consideration without adequately shopping the Partnership. As described in more detail below, given PVR's recent solid performance as well as its strong future growth prospects, the proposed consideration unitholders will receive is inadequate and undervalues the Partnership.

4.      The implied value of $28.68 per PVR unit improperly includes the value of the difference between PVR's and Regency's respective annualized distribution which, as asserted by the Board, is intended to make PVR unitholders "whole."

5.      Even so, the implied value of the merger consideration purported by Defendants represents a 2% *discount* to PVR's 52-week high of $29.26 per unit on July 18, 2013.

6.      From the very beginning, the Board steered the process toward a friendly suitor who provide preferential terms to the Partnership.  For example, following the consummation of the Proposed Transaction, William H. Shea Jr. ("Shea"), Chief Executive Officer and President of PVR, and Robert B. Wallace ("Wallace"), Executive Vice President and Chief Financial Officer of PVR GP, will join the combined entity.  Thus, these friendly terms demonstrate that the process was steered away from other potential suitors and in favor of Regency and all to the detriment of the Partnership's unitholders.

7.      In May 2013, the Board entered into a fourth supplemental indenture (the "Fourth Supplemental Indenture").  Noteworthy, the Board negotiated a new term in the Fourth Supplemental Indenture that provides upon a change-of-control, the holders of the partnerships notes (the "Notes") may require the Partnership to purchase the Notes at a purchase price equal to 101% of the principal amount of the Notes, plus accrued and unpaid interest.  This provision was nothing more than an alternative poison pill designed to dissuade interested hostile parties from acquiring the Partnership by making the cost of any potential transaction unduly burdensome.[1]  However, the Board (defined below) waived this provision so that Regency could acquire the Partnership thereby further demonstrating that the process was steered towards a sale of the Partnership to Regency.

---

[1]      *See* PVR Partners, L.P. Form 8-K dated May 10, 2013.

8.      PVR insiders, including all Individual Defendants, are also incentivized to support the Proposed Transaction as they will receive special benefits which Plaintiff and other public unitholders are not entitled.

9.      Pursuant to the Merger Agreement, upon the consummation of the Proposed Transaction, all unvested stock awards held by PVR insiders – including all phantom units, restricted units, outstanding deferred common units – will automatically vest (or will be treated as an issued and outstanding common unit in the case of deferred common units).

10.     In addition, upon the consummation of the Proposed Transaction, certain members of PVR's management team (*i.e.*, from PVR GP) are expected to retain their leadership positions at the combined company to oversee the integration of the businesses.

11.     Defendants have exacerbated their breaches of fiduciary duty by agreeing to lock up the Proposed Transaction with unreasonable deal protection devices that serve to preclude other bidders from making a successful competing offer for the Partnership. Specifically, pursuant to the Agreement and Plan of Merger dated October 9, 2013 (the "Merger Agreement"), Defendants agreed to: (i) a strict no-solicitation provision that prohibits the Partnership from soliciting other potential acquirers, continuing ongoing discussions with potential acquirers or pursuing any alternative to the Proposed Transaction; (ii) prohibit PVR from releasing, modifying, or waiving any standstill or similar agreements related to a sale of the Partnership; (iii) a provision requiring PVR to notify Regency within 24 hours of receiving a competing offer or inquiry; (iv) a provision requiring PVR to provide Regency with five (5) days to match any superior proposal received by PVR and an additional three (3) days to match any subsequent superior proposals received by PVR; and (iv) a provision that requires the Partnership to pay Regency a termination fee of $134.5 million in order to enter into a transaction with a superior

bidder. These provisions substantially and improperly inhibit the Board's ability to act with respect to receiving, investigating, and pursuing superior proposals and alternatives, including a sale of all or part of PVR.

12.     On November 8, 2013, Regency filed a Form S-4 Registration Statement ("Registration Statement") with the U.S. Securities and Exchange Commission ("SEC") in support of the Merger. The Registration Statement contained the joint proxy statement of the Partnership and Regency's support of the merger. The Registration Statement fails to provide the Partnership's unitholders with material information or provides them with materially misleading information thereby rendering unitholders unable to make an informed decision on whether to vote in favor of the Proposed Transaction.

13.     Aided and abetted by the other Defendants, the Individual Defendants have breached their fiduciary duties of good faith, loyalty, due care, fair dealing and candor by acting in an unfair and unreasonable manner in connection with the Proposed Transaction.  Plaintiff seeks to enjoin the Proposed Transaction unless and/or until Defendants cure their fiduciary breaches.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction under 28 U.S.C. §1331 (federal question jurisdiction), as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder. The Court has supplemental jurisdiction over any claims arising under state law pursuant to 28 U.S.C. § 1367.

15.     The Court has personal jurisdiction over each of the Defendants because each either is organized under the laws of, conducts business in and maintains operations in this District, or is an individual who either is present in this District for jurisdictional purposes or has

sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

16.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because: (a) one or more of the Defendants either resides in or maintains executive offices here; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect here.

## PARTIES

17.    Plaintiff is, and has been at all relevant times, the owner of common units of PVR.

18.    Defendant PVR is a publicly traded Delaware limited partnership.  The Partnership owns and operates a network of natural gas midstream pipelines and processing plants, and owns and manages coal and natural resource properties in the United States.  It maintains its principal executive offices at Three Radnor Corporate Center, Suite 301, 100 Matsonford Road, Radnor, Pennsylvania 19087.  Its common units are listed on the New York Stock Exchange under the symbol "PVR."

19.    Defendant PVR GP, a Delaware limited liability company, is the general partner of the Partnership. Importantly, as is common among publicly traded limited partnerships, the Partnership is managed by PVR GP's directors and officers.

20.    Defendant William H. Shea ("Shea") has been the President of PVR GP since June 2012, and Chief Executive Officer ("CEO") and director of PVR GP since March 2010.

21.    Defendant Edward B. Cloues II ("Cloues") has been a director of PVR GP since January 2003 and has served as Chairman of the Board since July 2011.

6

22.     Defendant James L. Gardner ("Gardner") has been a director of PVR GP since January 2006.

23.     Defendant Robert J. Hall ("Hall") has been a director of PVR GP since March 2011.

24.     Defendant Thomas W. Hofmann ("Hofmann") has been a director of PVR GP since May 2009.

25.     Defendant E. Bartow Jones ("Jones") has been a director of PVR GP since May 2012.

26.     Defendant Marsha R. Perelman ("Perelman") has been a director of PVR GP since May 2005.

27.     Defendant John C. van Roden Jr. ("van Roden") has been a director of PVR GP since March 2011.

28.     Defendant Andrew W. Ward ("Ward") has been a director of PVR GP since May 2012.

29.     Defendant Jonathan B. Weller ("Weller") has been a director of PVR GP since March 2011.

30.     Defendants Shea, Cloues, Gardner, Hall, Hofmann, Jones, Perelman, van Roden, Ward, and Weller are collectively referred to as Individual Defendants and/or the Board.

31.     Defendant Regency is a Delaware limited partnership with its headquarters located at 3738 Oak Lawn Avenue, Dallas, TX 75219. Regency specializes in the gathering and processing, contract compression, treating and transportation of natural gas, and the transportation, fractionation and storage of natural gas and natural gas liquids.

32.     Defendant Regency GP is a Delaware limited liability company and the general partner of Regency.

33.     Defendant Merger Sub is a Delaware limited liability company wholly owned by Regency and was created for the purposes of effectuating the Proposed Transaction.

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

34.     By reason of Individual Defendants' positions with the Partnership as officers and/or directors of PVR GP, they are in a fiduciary relationship with Plaintiff and the other public unitholders of PVR and owe them, as well as the Partnership, at a minimum an implied contractual duty of good faith and fair dealing.

35.     The relationship between PVR's Board and its public unitholders is, in part, governed by the LPA – i.e., the Fifth Amended and Restated Agreement of Limited Partnership of Penn Virginia Resource Partners, L.P. dated May 17, 2012, and Amendment No. 1 thereto, dated August 16, 2012.

36.     The Section 2.1 of the LPA states: "Except as expressly provided to the contrary in this Agreement, the rights, duties (including fiduciary duties), liabilities and obligations of the Partners and the administration, dissolution and termination of the Partnership shall be governed by the Delaware [Revised Uniform Limited Partnership Act, 6 Del C. Section 17-101, et seq., as amended, supplemented or restated from time to time, and any successor to such statute ("Delaware Act")]."   The LPA does not expressly limit the fiduciary obligations of the Individual Defendants in connection with their approval of any merger, consolidation, or change in corporate control.

37.   Moreover, under the Delaware Act, partnership agreements in Delaware cannot "eliminate the implied contractual covenant of good faith and fair dealing." Allen v. Encore Energy Partners, L.P., 72 A.3d 93, 100 (Del. Jul. 22, 2013).

38.   Under Delaware law, in any situation where directors of a publicly-traded corporation undertake a transaction that will result in either (i) a change in corporate control, or (ii) a break-up of the corporation's assets, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders, including a significant premium at the highest price attainable in the market.   Thus, in order to diligently comply with their fiduciary duties, the Individual Defendants may not take any action that:

(a)   adversely affects the value provided to the corporation's shareholders;

(b)   favors themselves or will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c)   adversely affects their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

(d)   will provide the Individual Defendants with preferential treatment at the expense of the interests of the Company's public shareholders;

(e)   participating in any transaction where the Individual Defendants' loyalties are divided;

(f)   participating in any transaction where the Individual Defendants receive, or are entitled to receive, a personal financial benefit not equally shared by the public unitholders of the partnership; and/or

(g)   unjustly enriching themselves at the expense or to the detriment of the public unitholders.

9

39.     In addition, the LPA expressly requires PVR GP and the Individual Defendants to act in a manner that is "fair and reasonable to the Partnership" when resolving any potential or actual conflict of interest and, at all times, conduct themselves in good faith.

40.     Moreover, Section 3.4 of the LPA provides that all public unitholders have the right "to obtain true and full information regarding the status of the business and financial condition of the Partnership" and "to obtain such other information regarding the affairs of the Partnership as is just and reasonable."

41.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, are violating their fiduciary duties of good faith, loyalty, due care, fair dealing and candor owed to Plaintiff and other public unitholders of PVR under both the Partnership's LPA and under governing Delaware law, and have failed to provide Plaintiff and other PVR unitholders with true, full, and fair disclosures concerning the Proposed Transaction.

## CLASS ACTION ALLEGATIONS

42.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and/or entities that owned PVR common units (the "Class") as of October 10, 2013, the date on which the Proposed Transaction was announced. Excluded from the Class are Defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

43.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class. According

to the Merger Agreement, as of October 9, 2013, 101,237,863 common units were represented by the Partnership as outstanding. All members of the Class may be identified from records maintained by PVR or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

44.     Questions of law and fact are common to the Class, including, *inter alia*, the following:

(a)         Whether PVR GP and the Individual Defendants breached any of their fiduciary duties owed to Plaintiff and the other members of the Class in connection with the Proposed Transaction;

(b)         Whether PVR GP and the Individual Defendants have breached or violated any of the terms and conditions of the LPA in connection with the Proposed Transaction;

(c)         Whether Defendants aided and abetted PVR GP and the Individual Defendants in breaching their fiduciary duties;

(d)         Whether Defendants failed to provide Plaintiff and the other members of the Class with true, full and fair disclosure of all material information in connection with the Proposed Transaction;

(e)         Whether the Registration Statement contains material misrepresentations and/or omissions in violation of federal laws;

(f)         Whether the Individual Defendants, in bad faith and for improper motives, impeded or erected barriers to discourage other strategic alternatives including offers from interested parties for the Partnership or its assets;

(g)      Whether Defendants are engaging in self-dealing in connection with the Proposed Transaction;

(h)      Whether Plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated; and

(i)      Whether the Class entitled to injunctive relief or damages as a result of Defendants' wrongful conduct.

45.      Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the other members of the Class have sustained damages as a result of Defendants' wrongful conduct as alleged herein.

46.      Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.

47.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

## FURTHER SUBSTANTIVE ALLEGATIONS

*Partnership Background and its Poise for Growth*

*Introduction to the Partnership's Products and Services*

48.      PVR is an energy partnership focusing on ownership and operation of natural gas midstream pipelines and processing plants as well as the ownership and management of coal reserves and other natural resources. The Partnership has been publicly traded since October 2001 and has owned and leased coal reserves since 1882. PVR entered the natural gas midstream business in 2005 via purchases of gathering pipelines and processing plants in Texas and Oklahoma.

12

49.    The Partnership operates in three business segments: natural gas gathering in its Eastern Midstream segment, natural gas processing and gathering services in its Midcontinent Midstream segment and a Coal and Nature Resource Management segment.

50.    The Partnership's midstream assets, principally located in Texas, Oklahoma and Pennsylvania, provide gathering, processing and other related services to natural gas producers. Its coal and natural resource properties, primarily located in the Appalachian, Illinois and San Juan basins, are leased to third party operators in exchange for royalty payments.

51.    PVR's website suggests that the Partnership is a wise investment due to its diversified, strategically located and high quality assets; its simple, tax efficient and corporate governance-oriented structure; its experienced and focused management with a proven track record; and its steady financial performance with the prospect of visible organic growth.

### *The Partnership is Positioned for Growth in the Energy Equipment & Services Market*

52.    In recent years, the Partnership has launched a number of major forward-looking initiatives and continued its growth-oriented focus.

53.    In the Partnership's own words, "[their] natural gas pipeline projects in the Marcellus Shale are expected to propel material growth of [their] midstream business for the next several years. PVR completed construction and commenced operation of [their] new 24-inch diameter, 750 cubic feet per day ("MMcfd") capacity trunkline in Wyoming County, PA at the end of September 2012, and completed the third phase of [their] 30 inch diameter, 850 MMcfd capacity system in Lycoming County, PA in December 2012.  [PVR] anticipate[d] investing a total of $350-$400 million in internal growth projects during 2013."

54.    In May 2012, PVR significantly expanded its midstream business in the North Central Pennsylvania region of the Marcellus Shale with the acquisition of Chief Gathering.

13

Chief Gathering's assets include six natural gas gathering systems serving over 300,000 dedicated acres.

55.     Also in May 2012, PVR announced $380 million of planned Marcellus Shale midstream expansion projects, including the construction of the third phase of their 30-inch diameter, 850 MMcfd capacity trunkline in Lycoming County, Pennsylvania and the building of a parallel joint venture water pipeline that delivers fresh water to Marcellus producers for well completions.

56.     In June 2012 PVR completed construction of a second 60 MMcfd expansion to their recently acquired Antelope Hills processing plant in their Panhandle System that gathers natural gas in Texas and Oklahoma.  These two plant expansions relieved processing capacity constraints and positioned PVR to capture additional volumes from the continued strong drilling activity in the liquids-rich Granite Wash basin.

57.     As recently as September 3, 2013, PVR announced an agreement to provide trunkline, gathering and compression services in the Utica Shale for Hess Partnership. Defendant Shea boasted in PVR's September 3, 2013 press release that "Hess's selection of PVR as their midstream provider in the Utica Shale is another validation of [PVR's] growing reputation for supplying reliable high-quality midstream services to meet the needs of shale gas producers. [PVR has] done so successfully in the Marcellus Shale region, and … expect[s] to duplicate that success in the Utica Shale."

58.     The July 24, 2013 press release announcing PVR's second quarter 2013 financial results also portrayed the Partnership as an entity with much confidently anticipated future growth, stating that "[t]he development and build-out of important growth projects in the

14

Marcellus, Utica, Cline and Mississippian Lime continued during the second quarter of 2013."

Such projects included:

- The new interconnection into the Wyoming trunkline for Carrizo Oil & Gas and Reliance Group began service during June.

- Construction of the new "Severcool" compressor facility and central delivery point on the Wyoming County trunkline was completed and began operation during June. Completion of these facilities added 85 MMcfd of firm volume commitment to the Wyoming trunkline beginning July 1, 2013.

- The second phase of the new Lycoming gathering system, for which Inflection Energy is the primary shipper, was completed and began service in the second quarter.

- Completion of 13 new well connections in the Eastern Midstream Segment during the second quarter.

- Construction of the initial phase of [PVR's] gathering system in Greene County, Pennsylvania has been completed.  Volume on the system during the second quarter averaged 12 MMcfd.

- Early phase development work continues on a proposed new trunkline and gathering system in the Utica shale.

- Completion of 52 new well connections in the Midcontinent Midstream Segment during the second quarter.

59.    Defendant Shea stated in the aforementioned second quarter 2013 press release that "[PVR's] continued belief in the long-term prospects for our Eastern Midstream operations is supported by strong results from the wells that have been drilled and completed within our areas of operations, the continuing level of drilling activity within the region, and the overall scope and scale of the future drilling plans communicated by producers."

*The Partnership's Strong Financial Results*

60.    PVR has tended to display solid financial results throughout its history as a publicly traded partnership, thanks in large part to its natural gas midstream business with an established record of managed growth, its conservative debt holdings and its hedged commodity risk.

15

61.     For at least the past three months, no analysts on Reuters Finance recommended PVR as a sell or as an underperforming unit.  To the contrary, most analysts recommended PVR as either a hold, outperform, or buy.

62.     When announcing the Partnership's second quarter 2013 results, Defendant Shea stated that "[PVR's] second quarter results were consistent with [their] first quarter performance, and significantly ahead of last year's second quarter results."

63.     The PVR Board declared a quarterly distribution of $0.55 per unit payable in cash on August 14, 2013 to common unitholders of record at the close of business on August 7, 2013. This distribution equates to an annualized rate of $2.20 per unit, which was unchanged from the distribution paid with respect to the first quarter of 2013 and represented a 3.8% increase over the distribution paid with respect to the second quarter of 2012.

64.     Other PVR second quarter 2013 highlights include an adjusted EBITDA of $76.1 million as compared to $57 million during the same period in 2012 and a distributable cash flow of $49 million as compared to $32.9 million during the same period in 2012.

65.     PVR's 2012 Annual Report disclosed that in comparison to 2011, PVR's enterprise value (unit price times fully diluted units outstanding plus debt) at year-end was approximately $4.8 billion or almost 70% higher than year-end 2011's value, the Partnership's average natural gas volume grew by 90% to 1,018 MMcfd and its total cash distributions paid during the year increased by 8.2% to $2.10 per common unit.

66.     One particularly notable statistic in the 2012 Annual Report was that "[c]ompared with the prior year, 2012 Eastern Midstream average volumes grew by more than 400% to 586 MMcfd, total revenues increased by 280% to $99.4 million, and operating income net of acquisition-related costs more than doubled to $39.5 million."

67.     Despite PVR's continued stable growth in its midstream natural gas markets and its steadily increasing cash distributions to unitholders under its current management, the Board decided to sell the Partnership for inadequate consideration.

***The Board Allowed Conflicted Defendant Shea and PVR Management to Lead a Flawed Process***

68.     The process that led to the Merger Agreement was materially unfair from the outset as it was inevitably catered toward Regency.  The Board acquiesced to Defendant Shea and PVR management's personal interests at the expense of the Partnership's public unitholders and allowed Defendant Shea to drive negotiations with Regency without appointing a conflicts committee.

69.     Beginning in 2012, the Board discussed a sale of all or part of PVR's coal business and/or PVR's gas gathering and processing assets in Texas and Oklahoma in order to finance a portion of PVR's future capital needs.  On December 10, 2012, PVR executed a confidentiality agreement with Company A and began sharing due diligence to facilitate a sale of the Partnership's coal business.

70.     In January 2013, PVR retained Evercore Group, L.L.C. ("Evercore") as a financial advisor to assist in evaluating strategic alternatives.

71.     In March 2013, Company A made an undisclosed proposal to purchase PVR's coal business.  Without conferring with the Board or Evercore, PVR management concluded Company A's valuation range was not acceptable to PVR.  It is unclear whether PVR engaged in any further negotiations with Company A.  Similarly, on July 2, 2013 and June 20, 2013, PVR executed confidentiality agreements with Company B and Company C, respectively, in connection with a sale of PVR's coal business.  The Registration Statement does not disclose

17

whether discussions with these parties were the result of a sale process or the involvement, if any, of Evercore and/or the Board.

72.     In mid-July, Citigroup Global Markets Inc. ("Citi"), on its own initiative, contacted Defendant Shea and Robert B. Wallace ("Wallace"), PVR's chief financial officer ("CFO") to discuss the possibility of a merger between PVR and Regency.  PVR management asked Citi to arrange a meeting with Regency.

73.     At the July 23, 2013 regularly scheduled Board meeting, Evercore provided the Board with its analysis of PVR, including a preliminary valuation of each of PVR's business segments.  Evercore discussed, among other things, the challenges to divesting the coal or Midcontinent business segments, as well as contributing those businesses to a joint venture.  It is unclear if Evercore, PVR management and/or the Board discussed the proposal from Company A, the ongoing discussions with Companies B and C, and/or a possible business combination with Regency and the upcoming meeting between PVR management and Regency.

74.     In addition, at the July 23, 2013 Board meeting, Evercore suggested eight midstream MLPs that management and Evercore thought might be possible candidates for a business combination, four of which Evercore believed could pay a 30% premium to PVR's then-current unit price.  PVR management advised the Board that three of the four companies would not be interested in a business combination as two were pursuing a growth strategy and one was not interested in PVR's coal business. The Board concluded it was not in the best interest of PVR or its unitholders to commence a sale of all or part of the Partnership's business, but authorized PVR management to continue to explore a sale of the coal business or a joint venture in the Midcontinent region. The Registration Statement does not indicate the Board's

rationale for determining not to solicit the fourth company despite the fact that PVR management did not advise that it too would not be interested in a business combination.

75.     In August 2013, Companies B and C each made a proposal to purchase the Partnership's coal business.  Without seeking guidance form the Board and/or Evercore, PVR management concluded each undisclosed valuation range was not acceptable to PVR.  The Registration Statement does not disclose any further discussions or negotiations between PVR and Companies B and C.

76.     On August 7, 2013, Defendant Shea met with senior executives and the CEO of an MLP with gathering and processing assets ("Company X") in connection with a potential joint venture opportunity between PVR and Company X in the Midcontinent region, as well as joint business opportunities in Lycoming County, Pennsylvania.   Company X informed Defendant Shea they were not interested in a transaction as long as PVR had its coal business.  Company X and PVR executed a confidentiality agreement on August 30, 2013.

77.     On August 22, 2013, Defendant Shea, Wallace and Mark D. Casaday ("Casaday"), PVR's executive vice president and chief operating officer ("COO"), met with certain members of Regency management.  The parties determined to enter into a confidentiality agreement, which was executed on August 28, 2013.

78.     On August 28, 2013, Defendant Shea called and informed Defendant Cloues of the preliminary discussions with both Regency and Company X.  It is unclear if Defendant Shea informed Defendant Cloues of the proposals from Company B and Company C.  Defendant Cloues suggested Shea arrange a call with the entire Board.

79.     Between August 30 and September 4, 2013, Defendant Shea spoke with each of PVR's directors individually and informed them of his discussions with Regency and Company

X, as well as the indications of interest the Partnership received for its coal business from Companies A, B and C. The Registration Statement does not disclose why Defendant Shea and PVR management had not previously informed the Board of, *inter alia*, Company A's March 2013 proposal.

80.     After several discussions between PVR management and Regency, on September 17, 2013, Regency indicated that based on its review to date, Regency was prepared to discuss an exchange ratio in the range of 1.02 to 1.06 units of Regency for each unit of PVR, based on Regency's closing price on September 13, 2013.

81.     On September 18, 2013, PVR management met with Citi to discuss Regency and asked Citi to assist PVR in evaluating other parties that might be interested in acquiring the Partnership. On or around September 24, 2013, PVR engaged Citi to act as its financial advisor alongside Evercore in connection with a transaction between PVR and Regency. Pursuant to the terms of Citi's engagement, PVR agreed to pay Citi a fee of $1 million upon announcement of a transaction with Regency and an additional fee of $12 million upon consummation of such a transaction. It is unclear if the terms of Citi's engagement contemplate Citi's assistance in evaluating alternative parties that might be interested in acquiring PVR or an acquisition of PVR by a party other than Regency.

82.     At the September 24, 2013 Board meeting Defendant Shea reviewed Regency's preliminary proposal. Citi, the Board and PVR management considered certain other potential counterparties for a transaction with PVR. For undisclosed reasons, after deliberation the Board determined to continue its negotiations with Regency. The Board authorized Defendant Shea to make a counterproposal to Regency that included the following elements: (i) an exchange ratio range of 1.08 to 1.12; (ii) a commitment to make PVR's unitholders whole in 2014 on the

difference between PVR and Regency's current distribution ($2.20 and $1.86 per quarter, respectively); and (iii) meaningful financial participation of Regency GP by agreeing to forego a portion of its incentive distributions.

83.     Following the September 24 Board meeting, Defendant Shea indicated to Regency that, with respect to Regency's preliminary proposal with an exchange ratio range of 1.02 to 1.06, "**PVR did not feel that it appropriately reflected the value of PVR**[.]" (Emphasis added).  Defendant Shea communicated the Board's counterproposal.

84.     On September 26, 2013, Regency indicated it was prepared to discuss a valuation in the range of exchange ratios of 1.06 to 1.07 Regency units for each unit of PVR and was considering making the PVR unitholders whole on the distribution for four quarters, but could not commit to a specific distribution increase, which was exclusively in the discretion of Regency GP's board of directors.   Regency had not discussed a reduction of incentive distributions with the board of Regency GP.

85.     On October 3, 2013, Regency made a revised offer to PVR, backtracking from its September 26 proposal.  Regency indicated it was prepared to offer to acquire PVR with terms including: (i) an exchange ratio of 1.02 Regency units for each PVR unit (the low end of the range in Regency's September 17 proposal which, as of September 24, 2013, "**PVR did not feel . . . appropriately reflected the value of PVR**[.]"; (ii) no distribution make-up for PVR's unitholders and no commitment to raise the Regency distribution going forward; and (iii) no commitment by Regency GP to forego incentive distributions going forward.

86.     The Board met telephonically on October 3, 2013 to discuss the revised proposal. After discussion, apparently also backtracking from its own September 24, 2013 view that the range of exchange ratios of 1.02 to 1.06 did not "appropriately reflect the value of PVR," the

Board authorized Defendant Shea to push for a cash payment to compensate PVR unitholders for the difference between the distribution paid by the Partnership and Regency and monetary support of Regency GP.

87.    At the October 8, 2013 Board meeting, Evercore, which will receive a flat fee upon delivering a fairness opinion, opined that if Regency "agreed to any or all of a distribution make-whole, a commitment to raise the distribution or general partner support, it would enhance the value of the transaction to PVR's unitholders."

88.    Following the meeting, Defendant Shea informed Regency that "the PVR Board could support a transaction with an exchange rate of 1.02 provided Regency agreed to a cash payment to PVR unitholders of an amount equal to the difference between $2.20 per unit and the annualized amount of the Regency distribution for the quarter immediately prior to the closing, as adjusted by the exchange ratio," – a substantial reduction from PVR's September 24 counterproposal that PVR unitholders be made whole for 2014 – and that Regency agree to PVR's position on the remaining open issues regarding the merger agreement.

89.    Later that day, Regency agreed to make PVR unitholders whole for the difference between $2.20 per unit and the annualized amount of the Regency distribution for the quarter immediately prior to the closing and to compromise on open issues in the merger agreement.

90.    After resolving the remaining open issues in the merger agreement, on October 9, 2013, the Board approved the Merger Agreement, which was executed that same day.

91.    At no time during the process that led to the Proposed Transaction did the Board discuss establish a conflicts committee despite Defendant Shea and certain PVR executives' personal interest in a business combination with Regency which, pursuant to their respective

employment agreements, would trigger certain "change in control" benefits that would not be triggered by a sale of the Company's coal business.

***The Board Breaches its Fiduciary Duty by Entering Into the Proposed Transaction for Consideration that Undervalues the Partnership***

92.     In a press release dated October 10, 2013, the Partnership announced that it had entered into the Merger Agreement with Regency pursuant to which Regency, through Merger Sub, will acquire all of the outstanding PVR units for 1.020 common units of Regency for each PVR unit held, plus a one-time cash payment to PVR unitholders of approximately $40 million in the aggregate. The consideration to be received by PVR unitholders is ultimately valued at $28.68 per common unit based on Regency's closing price as of October 9, 2013.  Additionally, the Board failed to negotiate a "collar" to protect the consideration offered in the form of units from any sudden sharp movements in the price of Regency's units prior to the consummation of the Proposed Transaction.

93.     Given the Partnership's recent solid performance, its positioning for growth and the significant synergistic value to Regency in acquiring PVR, the Proposed Transaction consideration is inadequate and significantly undervalues the Partnership.

94.     The Proposed Transaction provides a premium of just 24.8% based on the volume weighted average closing price of PVR's common units for the last ten trading days ending October 9, 2013.

95.     Although the closing price of PVR's common units was $22.81 on October 9, 2013, PVR units had been trading in excess of the value of the Proposed Transaction's consideration as recently as in July 2013.  In fact, on July 19, 2013, PVR closed at $28.93 per unit – 25 cents higher than the implied value of the $28.68 per common unit to be received by PVR unitholders in the Proposed Transaction.

96.     Further, the Proposed Transaction will have a significant dilutive effect on the Partnership's public unitholders' interest because upon the consummation of the Proposed Transaction the Partnership's public unitholders will only own approximately 38% of the combined entity.

97.     In addition, the Proposed Transaction consideration fails to adequately compensate PVR's unitholders for the very significant synergies created by the Proposed Transaction. The Proposed Transaction is a strategic merger for Regency: by attaining PVR's assets, Regency vastly increases its geographic diversification as well as its earnings diversification. When combining PVR's geographic reach with its own, Regency will have exposure to the majority of the U.S.'s major hydrocarbon plays.

98.     Furthermore, the Proposed Transaction provides Regency with an overall lower cost of capital. The larger, more diversified entity that would emerge from the Proposed Transaction will likely be viewed as a less risky investment than either Partnership on its own. This is particularly the case given that PVR has converted the vast majority of its revenue to reliable fee-based agreements. This steady source of income will assist in Regency's quest for an investment grade credit rating. A higher credit rating would likely mean a lower cost of debt and equity funding for Regency.

99.     Regency has disclosed that the Proposed Transaction will be dilutive in the short term, but expects that over time the assets gained from PVR will be immensely profitable. In the October 10, 2013 Press Release announcing the Proposed Transaction, the President and CEO of Regency, Michael J. Bradley, recognized the substantial value of the synergies provided by PVR:

> This acquisition enhances our overall geographic diversity by providing Regency with a strategic presence in two prolific producing areas, the Marcellus and Utica shales in the Appalachian Basin and the Granite Wash in the Mid-Continent region. These are tremendously complementary businesses, and as a result, we expect the increased

footprint and scale to create significant synergies and provide substantial organic growth opportunities that will continue to support our goal of increasing distributions and creating unitholder value.

100.    Despite the multiple valuable synergies inherent in the transaction for Regency, however, the Board failed to secure a fair price for either the intrinsic value of the Partnership's assets or the value of the Partnership's assets to Regency.

101.    Regency is seeking to acquire the Partnership at the most opportune time, at a time when the Partnership is performing very well and is positioned for tremendous growth.

***The Preclusive Deal Protection Devices***

102.    In May 2013, the Board entered into the Fourth Supplemental Indenture. Noteworthy, the Board negotiated a new term in the Fourth Supplemental Indenture that provides upon a change-of-control, the holders of the partnerships Notes may require the Partnership to purchase the Notes at a purchase price equal to 101% of the principal amount of the Notes, plus accrued and unpaid interest.  This provision was nothing more than an alternative poison pill designed to dissuade interested hostile parties from acquiring the Partnership by making the cost of any potential transaction unduly burdensome.  However, noteworthy here, the Board waived this provision so that Regency could acquire the Partnership.  These steps taken by the Board further evinces that the process was steered towards a sale of the Partnership to Regency.

103.    In addition, as part of the Merger Agreement, Defendants agreed to certain onerous and unreasonable deal protection devices that operate conjunctively to make the Proposed Transaction a fait accompli and ensure that no competing offers will emerge for the Partnership.

104.    Section 5.3(a) of the Merger Agreement – part of the "no solicitation" provision – requires PVR to terminate all discussions and negotiations with all other potential acquirers and

bars the Partnership from soliciting interest from others in order to procure a superior alternative transaction to the Proposed Transaction with Regency.

105.   Section 5.2(a) of the Merger Agreement prohibits the Partnership from "releas[ing] any Person from, or modify[ing] or waiv[ing] any provision of, any standstill, confidentiality, or similar agreement . . . related to a sale of [the Partnership] or any of its material Subsidiaries."

106.   In the event that there is unsolicited interest by a potential competing acquirer, § 5.3(b) requires PVR to enter into a confidentiality agreement with confidentiality and standstill provisions that are no less restrictive than those provisions in PVR's confidentiality agreement with Regency and PVR may not waive the standstill provisions without first providing written notice to Regency.

107.   Pursuant to § 5.3(c) of the Merger Agreement, should an unsolicited bidder submit a competing proposal, the Partnership must notify Regency of the bidder's identity and the terms of the bidder's offer. Thereafter, § 5.3(d) demands that should PVR desire to enter into a superior competing proposal, it must grant Regency a minimum of five days during which time the Partnership must negotiate in good faith with Regency (if Regency so desires) and allow Regency to amend the terms of the Merger Agreement to make a counteroffer so that the Board will not effect an adverse recommendation change against the Proposed Transaction. In the event that the Partnership receives a revised superior proposal from the competing bidder, PVR must provide Regency a 3-day period to make a matching or superior counteroffer.

108.   In other words, the Merger Agreement gives Regency access to any rival bidder's information and allows Regency a free right to top any superior offer simply by matching it. Accordingly, no rival bidder is likely to emerge and act as a stalking horse, because the Merger

Agreement unfairly assures that any "auction" will favor Regency and piggy-back upon the due diligence of the foreclosed second bidder.

109.    Section 7.3 of the Merger Agreement also requires PVR to pay a termination fee of $134.5 million to Regency if the Partnership decides to terminate the Proposed Transaction in favor of superior competing offer, thereby essentially requiring that any competing bidder agree to pay a huge naked premium for the right to provide the unitholders with a superior offer.

110.    Ultimately, these preclusive deal protection provisions unreasonably restrain the Partnership's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Partnership. The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

111.    Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Partnership unitholders will continue to suffer absent judicial intervention.

***The Materially Misleading Registration Statement***

112.    To make matters worse, on November 8, 2013 Regency filed the Registration Statement with the SEC, which contained the joint proxy statement/prospectus of PVR and Regency. The Registration Statement was disseminated to the PVR's public unitholders in an attempt to convince PVR unitholders to vote in favor of the Proposed Transaction. The Registration Statement fails to provide PVR's unitholders with certain material information concerning the financial and procedural fairness of the merger. Without such information PVR unitholders cannot make a fully informed decision about whether to vote in favor of the Proposed Transaction.

*Disclosures Concerning the Prospective Financial Information of PVR and Regency*

113.    Defendants failed to disclose a fair summary of all projections of the Partnership prepared by PVR's management and provided to and/or considered by the Board, Evercore, Regency, and/or other potential bidders and strategic partners during the process that led to the Proposed Transaction.  The summary of the management-prepared projections of PVR included in the Registration Statement is materially incomplete.  Specifically, Defendants failed to disclose the following line items:

(a)     unlevered free cash flow for each of the Case I and Case II Projections, for the years 2014 and 2015, as well as for the  years 2014 – 2018 which Evercore utilized in its *Discounted Cash Flow ("DCF") Analysis*;

(b)     annualized distributions or dividends;

(c)     earnings per unit;

(d)     taxes or tax rate;

(e)     changes in working capital;

(f)     adjusted net income;

(g)     depreciation and amortization;

(h)     cost savings and other synergies; and

(i)     operating income.

114.    Defendants further omitted the summary of the Case I and Case II "sum-of-the-parts" Projections for each of PVR's business segments, *i.e.*, Eastern Midstream, Midcontinent Midstream, and Coal.  This is particularly relevant given that the Board was considering a separate sale of the Coal segment to certain potential bidders in conjunction with a sale of the

rest of the Partnership to Company X.  Specifically, Defendants failed to disclose the following line items for each of PVR's three business segments:

(a)     adjusted EBITDA;

(b)     distributable cash flow;

(c)     distributable cash flow per PVR unit;

(d)     unlevered free cash flow;

(e)     annualized distributions or dividends;

(f)     earnings per unit;

(g)     taxes or tax rate;

(h)     changes in working capital;

(i)     adjusted net income;

(j)     depreciation and amortization;

(k)     cost savings and other synergies; and

(l)     operating income.

115.    With respect to management-prepared projections of PVR, Defendants also failed to disclose:

(a)     Evercore's role, if any, with respect to the creation or preparation of PVR's Case I and Case II Projections, including any assumptions made by Evercore and the basis for each such assumption;

(b)     the reason that PVR management only prepared projections for two years, 2014 and 2015;

(c)     the definition of "Distributable Cash Flow" as used in the Case I and Case II Projections;

(d)     with respect to the "Distributable Cash Flow per Unit" under the PVR Case II Projections, the difference in the treatment of PVR's Special Units and calculation of weighted average units outstanding by Evercore in its Fairness Opinion analyses and by Citi in its September 24, 2013 presentation to the Board;

(e)     the rationale for PVR management's failure to create an upside case set of financial projections given that the Case I Projections do not include "unspecified growth projects which may arise over time consistent with PVR's experience."

116.   Defendants should also disclose whether PVR provided the same projections of PVR to the Board, Evercore, Regency, and the other prospective bidders and strategic partners.

117.   In addition, Defendants should disclose whether projections of Regency prepared by either the management of PVR, Evercore, or Regency were ever provided to the Board, or considered by Evercore, and if so, provide a fair summary of those projections.

*Disclosures Concerning Evercore's Financial Analyses*

118.   The Registration Statement fails to disclose certain key data and inputs underlying the financial analyses relied upon by Evercore, PVR's financial advisor, in rendering its Fairness Opinion.

119.   The Registration Statement fails to disclose Evercore's basis for declining to use Regency's actual closing price of $27.93 on October 8, 2013 to calculate the implied value of the merger consideration under the Proposed Transaction in favor of deriving the implied value based on the assumed value of the cash amount or $0.28 per unit, which represents the difference between the annualized distribution of PVR and Regency meant to make PVR unitholders "whole," and "a selected range of values of the Regency common units . . . determined by Evercore based on its knowledge of Regency and its analysis [of Regency]."

120.    The Registration Statement also fails to disclose the definition of "distributable cash flow" as used in the analyses underlying Evercore's Fairness Opinion.

121.    The Registration Statement states that Evercore "reviewed the pro forma financial impact to certain financial metrics that we deemed relevant as a result of the Merger based on a combination of certain financial performance scenarios including synergies as provided by management of RGP and the Partnership," but omits quantitative information concerning "synergies."

122.    The Registration Statement failed to disclose the fully diluted units outstanding, equity value and enterprise value, at both the unaffected price and the offer price, for PVR and Regency.

123.    The Registration Statement fails to state whether the summary of the PVR projections under the section concerning Evercore's analyses underlying its Fairness Opinion reflects assumptions made by Evercore to PVR management-prepared projections and, if so, the basis for these projection assumptions.  In addition, with respect to the PVR projections included in this section:

    (a)    the basis for including equity offerings in the Case I and Case II Projections and how the timing and assumed issuance price were determined for each of the two projected $300 million equity offerings; and

    (b)    the basis for the assumed 7.0% and 6.5% interest rates relating to the projected $200 million senior note offering in the quarter ending June 30, 2014 and $300 million note offering in the quarter ending September 30, 2015, respectively.

124.    The Registration Statement failed to disclose the various material aspects of Evercore's *DCF Analysis* of PVR, including:

(a)    The unlevered free cash flow projections for 2014 through 2018 used by Evercore, including the assumptions made by Evercore in calculating the projections that were not provided by PVR's management and the bases for each assumption;

(b)    With respect to the projected cash flows approach, the bases and assumptions used to determine a discount rate ranges, the EBITDA multiples ranges, and the perpetuity growth rates ranges assumed by Evercore, including the source and identity of all assumptions used in the Capital Asset Pricing Model ("CAPM") and weighted average cost of capital ("WACC"), for total PVR, and for the sum-of-the-parts of PVR, *i.e.*, Eastern Midstream, Midcontinent Midstream, and Coal, and clarification that CAPM is the basis for a cost of equity and not a basis for WACC;

(c)    the bases and assumptions with respect to total PVR and each of PVR's three business segments (*i.e.*, Eastern Midstream, Midcontinent Midstream, and Coal) under the sum-of-the-parts analysis; and

(d)    With respect to the projected distributions approach, Evercore's bases for its selection of a terminal exit yield ranges of 8.5% to 9.5%, and provide the formula for the "total expected market return methodology" and the basis for why it was deemed to be an appropriate method for determining discount rates with respect to projected distributions.

125.    The Registration Statement fails to disclose various material aspects of Evercore's *Precedent M&A Transaction Analysis* for PVR, including:

(a)    the objective criteria utilized by Evercore to select the transactions utilized in its analysis;

(b)    identifying which of the selected transactions falls within each of PVR's three business segments, *i.e.*, Eastern Midstream, Midcontinent Midstream, and Coal;

(c)      the multiples observed for each of the selected precedent transactions – in fact, the Registration Statement does not even provide the low, high, mean or median of the observed multiples;

(d)      Evercore's rationale for considering only the EBITDA multiples and not other relevant multiples, including revenue, dividend yield, equity value, and distributable cash flow;

(e)      Evercore's basis for selecting different ranges of multiples for Eastern Midstream, Midcontinent Midstream, and Coal, and for applying the EBITDA multiples range of 12.5x to 14.0x for 2014 and 8.5x to 10.0x in 2015 with respect to Eastern Midstream, 9.0x to 10.5x for 2014 and 2015 with respect to Midcontinent Midstream, and 5.0x to 6.0x for 2014 and 2015 with respect to Coal;

(f)      Evercore's basis for not examining transactions involving coal operations to value PVR's Coal segment;

(g)      Evercore's rationale in applying historical multiples to PVR's forward EBITDA, then discounting back to present value;

(h)      Evercore's rationale in applying a discount rate to growth capital expenditures in 2014 and 2015 and the dollar impact the application of this discount rate had on the PVR common unit range of prices set forth in this analysis; and

(i)      The reason a benchmark analysis was not presented.

126.    The Registration Statement fails to disclose various material aspects of Evercore's *Peer Group Trading Analysis* for PVR, including:

(a)      the objective criteria used to select each of the master limited partnerships ("MLPs") that Evercore deemed comparable;

(b)      the "specific financial and operating data" and the pricing multiples and ratios observed for each of the selected MLPs – in fact, the Registration Statement does not even provide the low, high, mean or median of the observed multiples;

(c)      Evercore's rationale for considering only the EBITDA multiples and not other relevant multiples, including revenue, dividend yield, equity value, and distributable cash flow;

(d)      What "considerations" and "specific characteristics" influenced Evercore's selection of the range of pricing multiples of 11.0x to 12.5x for 2014 and 9.5x to11.0x for 2015 with respect to Eastern Midstream, 10.5x to 12.0x for 2014 and 9.0x to10.5x for 2015 with respect to Midcontinent Midstream, and 5.0x to 8.0x for 2014 and 4.0x to 7.0x for 2015 with respect to Coal;

(e)      Why Evercore examined coal MLPs for this analysis, but did not examine coal companies in their *Precedent M&A Transaction Analysis* for PVR; and

(f)      The reason a benchmark analysis was not presented.

127.    The Registration Statement fails to disclose various materials aspects of Evercore's *Premiums Paid Analysis* for PVR, including:

(a)      The objective criteria used to identify the selected transactions;

(b)      The date, target, acquirer, target enterprise value, and premium for each of the selected transactions; and

(c)      Whether Evercore gave this Analysis equal weight to the other analyses performed as part of its Fairness Opinion.

128.    The Registration Statement further fails to disclose various material aspects of Evercore's *DCF Analysis* for Regency, including:

(a)     The unlevered free cash flow projections for 2014 through 2018 used by Evercore, including the source of the projections and any assumptions made by Evercore;

(b)     With respect to the projected cash flows approach, the bases and assumptions used to determine a discount rate ranges, the EBITDA multiples ranges, and the perpetuity growth rates ranges assumed by Evercore, including the source and identity of all assumptions used in the CAPM and WACC, and clarification that CAPM is the basis for a cost of equity and not a basis for WACC;

(c)     With respect to the projected distributions approach, Evercore's basis for assuming lower exit range yields of 7.0% to 8.0% for Regency than the assumed exit range yields of 8.5% to 9.5% for PVR.

129.    The Registration Statement fails to disclose various material aspects of Evercore's *Precedent M&A Transaction Analysis* for Regency, including:

(a)     the objective criteria utilized by Evercore to select the transactions utilized in its analysis;

(b)     the multiples observed for each of the selected precedent transactions – in fact, the Registration Statement does not even provide the low, high, mean or median of the observed multiples;

(c)     Evercore's rationale for considering only the EBITDA multiples and not other relevant multiples, including revenue, dividend yield, equity value, and distributable cash flow;

(d)     Evercore's rationale for applying the EBITDA multiples range of 10.0x to 12.0x;

35

        (e)     Evercore's rationale in applying historical multiples to Regency's forward EBITDA, then discounting back to present value;

        (f)     Evercore's rationale in applying a discount rate to growth capital expenditures in 2014 and 2015 and the dollar impact the application of this discount rate had on the PVR common unit range of prices set forth in this analysis; and

        (g)     The reason a benchmark analysis was not presented.

    130.    The Registration Statement fails to disclose various material aspects of Evercore's *Peer Group Trading Analysis* for Regency, including:

        (a)     The objective criteria used to select the MLP's that Evercore deemed comparable;

        (b)     The multiples and ratios observed for each of the selected MLPs – in fact, the Registration Statement does not even provide the low, high, mean or median of the observed multiples;

        (c)     Evercore's rationale for considering only the EBITDA multiples and not other relevant multiples, including revenue, dividend yield, equity value, and distributable cash flow;

        (d)     What "considerations" and "specific characteristics" influenced Evercore's selection of the range of pricing multiples; and

        (e)     The reason a benchmark analysis was not presented.

    131.    The Registration Statement should disclose the number of price targets that Evercore examined as part of its *Wall Street Research Price Targets* for Regency as well as why price targets were not examined for PVR.

132.    The Registration Statement failed to disclose the various material aspects of Evercore's *Contribution Analysis* for PVR and Regency, including:

(a)    The year-by-year contributions for EBITDA, distributable cash flow, and distributions/dividends for both PVR Case I and Case II considered by Evercore in this Analysis; and

(b)    Any other financial metrics Evercore analyzed in this Analysis.

133.    The Registration Statement failed to disclose the various material aspects of Evercore's *Pro Forma Analysis*, including the specific results of Evercore's analysis.

*Disclosures Concerning the Flawed Process*

134.    The Registration Statement also fails to disclose material information concerning the flawed process the Board employed in connection with the Proposed Transaction:

(a)    Who initiated contact between Companies A, B, and C and PVR in connection with the sale of the Partnership's coal business;

(b)    What other companies, if any, PVR had informal discussions with during 2012 and/or 2013 regarding a potential sale of all or part of PVR's business;

(c)    With respect to the potential sale of the Partnership's coal business to Companies A, B, and C: (i) the ranges of values provided by Companies A, B and C, respectively; (ii) the basis for PVR management's determination that the ranges of values provided by Companies A, B and C, respectively, were unacceptable; (iii) whether the Board considered the range of values provided Companies A, B and C, respectively and, if so, when the Board considered these proposals and the determinations made by the Board in connection thereto; (iii) whether PVR management engaged Companies A, B, and/or C in further discussion and/or negotiations after receiving the respective indications of interest; (iv) why PVR

management did not discuss the process with Companies A, B and C, including Company A's March 2013 proposal and Companies B and C's August 2013 proposals, with the Board prior to Defendant Shea's discussions with Board members between August 30 and September 4, 2013, after Defendants Shea had already determined that the indications of interest were not in the best interests of the Partnership; and (v) what discussions, if any, PVR management had with Evercore regarding the proposals.

        (d)     Whether the confidentiality agreements entered between PVR and Companies A, B, and C, or any other potential buyers or strategic partners for a segment or the entirety of PVR's business, included a standstill provision and, if so, whether such a provision continues to survive;

        (e)     Whether the Board directed management, Evercore, or any of the Partnership's other agents to solicit the interest of any other businesses that may be interested in potentially purchasing PVR's coal business aside from Companies A, B, and C;

        (f)     Whether the Board considered the formation of a conflicts committee and, if so, the reasons for declining to form one;

        (g)     Whether the Board considered any other financial advisors prior to determining to retain Evercore in January 2013, the Board's rationale for retaining Evercore as its financial advisor;

        (h)     Whether and when the Board was made aware of Evercore's provision of services to Regency and its affiliates in 2011 through 2013, and the Board's rationale for failing to retain another financial advisor (other than Evercore or Citi) in connection with Regency's interest in the Partnership;

(i)      Whether the Board attempted to include a "collar" with respect to the Exchange Ratio and the Board's rationale for failing to include a "collar" to protect PVR unitholders against fluctuations in the price of Regency common units;

(j)      The Board's rationale for failing to solicit the interest from any of the "four potential candidates" who were "believed to be able to pay a 30% premium to PVR's" unit price in mid-July 2013, particularly the candidate who management did not disqualify as being unlikely to be interested;

(k)      Given that the merger consideration under the Proposed Transaction represents a discount to PVR's unit price in mid-July 2013, the Board's rationale for failing to conduct any market check or solicitation process prior to approving the Merger Agreement, particularly given that Evercore advised in early October 2013 that there may be a "few midstream companies that would potentially consider paying a premium for PVR comparable to that offered by Regency;

(l)      The value of each offer and counteroffer based on the closing prices of the Regency common stock that day;

(m)      The specific fees Evercore has received in connection with the services performed for PVR, Regency and their affiliates in the past three years; and

(n)      What compensation Citi would receive, if any, in connection with a transaction between PVR and an alternate party.

## CLAIMS FOR RELIEF

### COUNT I

**On Behalf of Plaintiff and the Class for Violations of Section 14(a)
of the Exchange Act and Rule 14a-9 Promulgated Thereunder
Against the Partnership and the Individual Defendants**

135.    Plaintiff repeats all previous allegations as if set forth in full herein, excluding the Class Action Allegations set forth herein.

136.    Defendants have issued the Registration Statement with the intention of soliciting unitholder support of the Proposed Transaction.

137.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act provides that a proxy statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

138.    Specifically, the Registration Statement violates Section 14(a) and Rule 14a-9 because it is materially misleading in numerous respects and omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, Defendants should have known that the Registration Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

139.    The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth.

140.    The misrepresentations and omissions in the Registration Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

## COUNT II

**On Behalf of Plaintiff and the Class for Violations of Section 20(a) of the Exchange Act
Against the Individual Defendants**

141.    Plaintiff brings this Exchange Act claim on behalf of himself as an individual and on behalf of all other PVR unitholders.

40

142.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

143.    The Individual Defendants acted as controlling persons of PVR within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of PVR, and participation in and/or awareness of the Partnership's operations and/or intimate knowledge of the false statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Partnership, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

144.    Each of the Individual Defendants were provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

145.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Partnership, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.  The Registration Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of this document.

146.    In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Registration Statement purports to describe the various issues

and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

147.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

148.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

## COUNT III

### On Behalf of Plaintiff and the Class Against the Individual Defendants
### For Breach of Fiduciary Duties

149.    Plaintiff incorporates by reference, and repeats and realleges each and every allegation contained above, as though fully set forth herein.

150.    The Individual Defendants have breached and are breaching their fiduciary duties of good faith, loyalty, due care, fair dealing and candor owed to Plaintiff and the other public unitholders of PVR under Delaware law and the LPA, and have acted to put their personal interests ahead of the interests of PVR's public unitholders.

151.    By the acts, transactions, and courses of conduct alleged herein, the Individual Defendants, individually and collectively, have acted unfairly and unreasonably toward Plaintiff and the other members of the Class by entering into the Merger Agreement and the Proposed Transaction.

42

152.    The Individual Defendants have breached their fiduciary duties owed to the unitholders of PVR and violated PVR's LPA because, among other reasons:

(a)    they failed to properly value PVR, and instead agreed to the fixed Exchange Ratio and inadequate cash consideration under the Proposed Transaction which reflect unfair and inadequate value for the Partnership;

(b)    they pursued the Proposed Transaction in order to further their own interests to the detriment of Plaintiff and the other unitholders;

(c)    they ignored or did not protect against the numerous conflicts of interest resulting from the Board member's own financial interests in the Proposed Transaction; and/or

(d)    they failed to take the necessary steps to comply with their fiduciary duties and PVR's LPA.

153.    The Individual Defendants' conduct constitutes gross negligence, recklessness, willful misconduct, bad faith or knowing violations of law that cannot be discharged under the waivers of the PVR LPA.

154.    Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the other Class members, and may consummate the Proposed Transaction, to the irreparable harm of the Class.

155.    Plaintiff and the other Class members have no adequate remedy at law and are entitled to injunctive relief.

## COUNT IV

**On Behalf of Plaintiff and the Class Against the Individual Defendants**
**For Breach of Fiduciary Duty -- Disclosure**

156.    Plaintiff repeats all previous allegations as if set forth in full herein.

157.    The fiduciary duties of the Individual Defendants in the circumstances of the Proposed Transaction require them to disclose in a non-misleading way to Plaintiff and the Class all information material to the decisions confronting PVR unitholders.

158.    As set forth above, the Individual Defendants have breached their fiduciary duty through materially misleading disclosures and material disclosure omissions.

159.    As a result, Plaintiff and the Class members are being harmed irreparably.

160.    Plaintiff and the Class have no adequate remedy at law.

## COUNT V

**On Behalf of Plaintiff and the Class Against
PVR, PVR GP, Regency, Regency GP and Merger Sub
For Aiding and Abetting the Individual Defendants' Breach of Fiduciary Duty**

161.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

162.    Defendants PVR, PVR GP, Regency, Regency GP and Merger Sub have acted and are acting with knowledge of, or with reckless disregard to, the fact that the Individual Defendants are in breach of their fiduciary duties to PVR unitholders, and have participated in such breaches of fiduciary duties.

163.    Defendants PVR, PVR GP, Regency, Regency GP and Merger Sub knowingly aided and abetted the Individual Defendants' wrongdoing alleged herein.  In so doing, the Defendants PVR, PVR GP, Regency, Regency GP and Merger Sub rendered substantial assistance in order to effectuate the Individual Defendants' plan to consummate the Proposed Transaction in breach of their fiduciary duties

164.    Plaintiff and the Class have no adequate remedy at law.

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

(A)    declaring this action to be a class action and certifying Plaintiff as the Class representatives and his counsel as Class counsel;

(B)    declaring that Defendants have aided and abetted, or breached their fiduciary duties, violated the LPA, and/or breached the implied covenant of good faith and fair dealing owed to Plaintiff and the other members of the Class;

(C)    enjoining, preliminarily and permanently, the consummation of the Proposed Transaction, unless and/or until Defendants cure their breaches of the duties owed to Plaintiff and the other members of the Class under Delaware law and PVR's LPA;

(D)    directing Defendants to fairly and fully disclose all material information concerning the Proposed Transaction;

(E)    in the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

(F)    directing that Defendants account to Plaintiff and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties and violations of the LPA;

(G)    awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(H)    granting Plaintiff and the other members of the Class such further relief as the Court deems just and proper.

Dated: November 25, 2013                    Respectfully submitted,

                                            **BRODSKY & SMITH, LLC**
                                            _/s/ Evan J. Smith_

45

Evan J. Smith
Marc Ackerman
Two Bala Plaza, Suite 510
Bala Cynwyd, PA 19004
(610) 667-6200

*Attorneys for Plaintiff*

**WEISSLAW LLP**
Richard A. Acocelli
Michael A. Rogovin
Kelly C. Keenan
1500 Broadway, 16th Floor
New York, NY 10036
Tel:     (212) 682-3025
Fax:     (212) 682-3010